### J. H. Fench v. The State.

#### No. 836. Decided November 30, 1910.

**Forgery of Letter—Insufficiency of the Evidence—Consent.**

Where, upon trial of forgery of a letter, it appeared from the evidence that the defendant signed the name of the person alleged to have been forged with said person's consent, the conviction could not be sustained.

Appeal from the District Court of Webb. Tried below before the Hon. J. F. Mullally.

Appeal from a conviction of forgery of a letter; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*John L. Dannelley*, for appellant.—On the question of the insufficiency of the evidence: Howard v. State, 18 Texas Crim. App., 348; Hernandez v. State, 20 Texas Crim. App., 151; Price v. State, 36 Texas Crim. Rep., 143.

*John A. Mobley*, Assistant Attorney-General, for the State.

DAVIDSON, Presiding Judge.—Appellant was charged with and convicted of forging a letter. Omitting the letterhead and some other matters, the letter reads as follows:

"Laredo, Texas, March 26, 1909.
"William Hopman & Co. (meaning Company),
   "Cleveland, O. (meaning Ohio).
"Gentlemen: We will commence shipping about April 3. Our onions will be graded and sorted carefully; we will ship nothing but first-class stock. Wire us on receipt of this, how many cars you can handle immediately; also what the market conditions are, your commission on carload lots. On the receipt of same we will wire you the number of cars we can consign to you. Address all telegrams and letters to Joseph McKendrick, telegrams in care of John A. Applewhite, all drafts payable to J. H. Fench.
                    "Jos. (meaning Joseph) McKendrick."

McKendrick testified for the State to the effect that he never signed this letter, nor did he authorize defendant or anyone else to sign his name to it. He further testified that he began working for appel-

lant in January, 1908, and continued so working until August, 1909. In the spring of 1908 he and appellant raised a crop of onions on the Graceland farm, in Webb County, near Laredo. The farm belonged to appellant, he having purchased it from Mrs. Dodd. Before witness began working for appellant they entered into an agreement that witness was to receive as his salary, his board, $50 per month, and ten percent of the net proceeds of the crop or crops that might be raised on the farm. When the crop was gathered the onions were shipped in witness' name, consigned to witness' son-in-law in the north, and some were consigned to McKendrick himself after he had gone north to sell the crop. Nothing was made out of that crop. The witness continued to work on the farm and raise another crop for the spring market of 1909. No new agreement was made between appellant and witness concerning the crop of 1909. His connection with the crop continued under the original agreement. In October, 1908, appellant went down into Mexico to take charge of a mine belonging to Bruni & Sanchez. Before leaving he made arrangements with Mr. Bruni to furnish witness with $15 per week and $30 in addition at the end of each month for the purpose of paying the expenses of the farm, and before leaving he gave witness a mortgage on his, appellant's, teams, plow tools and wagon to secure him in the payment of his monthly salary for the time he had already been working. Some time after appellant had gone to Mexico, Mr. Bruni informed witness that he could not advance him any more money on appellant's name, but that he would let witness have the money. Witness so wrote appellant in Mexico, who replied to go ahead and do the best he could, that it would be a great favor to him. This letter witness could not find, and same was not produced at the trial. Witness transferred the mortgage appellant had given him to Mr. Bruni, who furnished witness money to continue making the crop, which amounted to about $800. The witness contracted a few other debts which he thought were necessary to carry on the business about the farm. Appellant returned from Mexico in February, 1909, and went on the farm and assisted in working the farm and gathering the crop. The witness, however, continued managing the farm, but appellant was there the same as was the witness. Along about the first of April they began shipping their onion crop for the year 1909, the shipments being made in the name of the witness McKendrick. There was no agreement, he says, about shipping the crop in his name, nor as to appellant's right to sign witness' name. Appellant just told witness to "ship the goods in your name and everything will go in your name," and witness said, "All right." He said as the goods were shipped in his name the money would be supposed to come back in his, witness', name. He further testified that appellant told him to open an account at the Milmo Bank in his, McKendrick's, name, which he did. Some of the checks came

payable to witness and some to appellant. He says he remembered that appellant turned over to him three checks, which he took to the bank to deposit, but the bank would not have them until witness signed them. He says, "I never'wrote the commission people to send any of the checks to Fench, nor did I object when the checks came payable to him, as I thought it all right." There is quite a lot of this witness' testimony going into details narrating what occurred between himself and appellant; among other things, all the money that witness had in the bank belonged to the farm, but it was in his, McKendrick's, name. He further testified in this connection that when appellant told him to ship the crop in his, witness', name, there was nothing said about his signing witness' name, but witness supposed that he did; that the letters came in his, witness', name, and either he himself or appellant would get them out of the postoffice and open them and they discussed the market and things connected with the business. Witness himself wrote some letters; that he did not know whether appellant wrote any or not, but guess he did. It seems from the testimony that appellant received one or two of the checks and cashed them and did not account to McKendrick, the witness, for the same. He also testified that appellant had a perfect right to ship the onions in his own name if he cared to, and that is what he should have done. There was no agreement in regard to it, but appellant simply told witness to ship the "stuff" in his, witness', name and everything would go in his, witness', name, and witness said all right.

Applewhite testified he owned a livery business in Laredo, and that appellant and McKendrick were around his place a great deal; that often telegrams would come to the witness for appellant and McKendrick, and that he, witness, would put them away and give them to either appellant or McKendrick, whichever came in first, and they generally read them when handed to them; that they often discussed in a general way the outlook of the crop, and from the conversations had with both appellant and McKendrick he understood that McKendrick was only working for a salary and the stuff all belonged to appellant.

Appellant testified in regard to purchasing the onion farm from Mrs. Dodd, and that he and McKendrick entered into a contract by which he was to pay McKendrick $50 a month and ten percent of the net earnings. That they raised in 1908 several carloads of onions, some of which were shipped in McKendrick's name to his son-in-law in the north. Appellant then sent McKendrick to Chicago to sell the onions himself, and while there appellant shipped him several carloads, but had never received anything to show for the proceeds; that McKendrick had never made any statement to him. He says he decided the old man, referring to McKendrick, had done the best he could and he said nothing about it. The same contract was continued for the year 1909, and his testimony in regard to the

contracts, etc., was practically as testified by McKendrick. That he came back from Mexico in February, and went out on the farm and went to work. Appellant further testified that just before they were ready to harvest he told McKendrick to ship everything in his, McKendrick's, name, as they had done the year before, and he, appellant, would attend to the correspondence, as he had always done, using his, McKendrick's, name. McKendrick said all right. He also directed McKendrick to open an account at the Milmo Bank in his, McKendrick's, name. To this McKendrick also agreed. He also told McKendrick that he thought it was a good idea to write some of the commission men and ascertain the market price of onions, and he agreed that was a good plan. So on March 26, 1909, he wrote eight or ten letters, all alike, only addressed to different people, asking about their commission charges and prices. The letter introduced in evidence, dated March 26, 1909, and addressed to Wm. Hopfman & Co., is one of these letters. That is the letter upon which forgery is assigned. They began harvesting the onion crop about April 3, selling the first two cars to Mr. Seabert. When the answers to the letters that appellant had written on March 26 came, McKendrick would sometime get them out of the office and sometime appellant would. They talked the matter over and compared prices, and decided to ship the next to Wm. Hopfman & Co., and did ship several carloads to Hopfman & Co. The first four cars brought $1822, and the next four cars brought $690, making in all about $2500. Appellant said that he knew what it had cost to raise a crop, and by this time Bruni had been paid, and there was a debt of about $600 for crates, $30 at Netze, $100 at Nelsons, and $39 at Swedbergs. Appellant says he kept the money mentioned arising from checks he cashed and never told McKendrick anything about it. That left nine cars, and what McKendrick did with money arising from their sales appellant says he was unable to tell. McKendrick had refused to let him have any of his own money, and so when the next drafts came appellant kept them instead of turning them over to McKendrick, as he had the first three received. He also states that McKendrick asked him why he kept the money, and he told him it was not any of his business. Appellant says he did not go to McKendrick and tell him that he had written the commission people to send checks and drafts to him because McKendrick knew that there were letters and drafts coming to appellant, and that he turned them over to McKendrick; that they received answers to all the letters written, and McKendrick read over these letters. There is quite a lot of kindred testimony in the record.

Appellant raises several questions in regard to charges and rulings of the court which we deem unnecessary to discuss, inasmuch as we are of opinion this record does not show a case of forgery. It is, we think, thoroughly apparent from what has been stated of the testimony above, that appellant signed McKendrick's name with his

consent; that he knew all about it, and that it was in carrying on of appellant's own business through his hired man, McKendrick, and that he had instructed McKendrick to run the business in his, Mc-Kendrick's, name, and to a large extent all these matters were done with full knowledge and consent of McKendrick. We do not feel justified in permitting a conviction of this sort to stand on the testimony as found in this record. It is not a case of forgery, and the evidence shows to our minds conclusively that it was not.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*